Case 14-1311 Lance McNeal v. Gary Kott et al. Oral argument not to exceed 15 minutes per side. Mr. Schneider for the appellants. Good morning, Your Honors. I've asked to reserve three minutes for rebuttal. May it please the Court, Counsel Clifton Schneider from the Michigan Department of Attorney General, appearing on behalf of defendants, appellants, Kott and Malone. Your Honors, Mr. McNeal testified that Kott, Officer Kott, was denying him restroom access during count in the prison two to three times per week, if not more. Now, count in the prison was a procedure whereby all the officers had to count all the prisoners throughout the entire prison. Generally, the prisoners were required to remain in their cells and not move about the prison during that count period. This was done for security interests so that the prison could account for all the prisoners throughout the prison. Officer Kott testified to those security interests in his affidavit. Now, Mr. McNeal clearly was suffering from incontinence. He was claiming that two to three times per week during this count period, he was unable to hold his urine. Now, count in this case was typically lasting between 33 and 46 minutes. Mr. McNeal was offered incontinence pads from healthcare, but he declined to accept that offer of incontinence pads. Instead, he was requesting that the officers make an exception and let him out to use the restroom during that count process. Now, the prison rules did allow an occasional rare exception, whereby after the officers actually counted the bodies in their individual unit, but before the entire prison count was clear with all the prisoners, the officer could make a rare occasional exception and let that prisoner out to use the restroom. Now, it seems like the hardest one of the incidents is the one where it seems everyone knows he has a problem. In fact, I guess support your side is accommodated either by an exemption from the count or, obviously, the account is passed, but the account is passed aside. I mean, it sounds like it's normally then that he has to go, he's let out, but we had this one time where he's not – they don't believe him. So I'm trying to figure out – that one seems a little funny because I don't know if he does have a problem. Do they just think he was manipulating him or what's going on there? Your Honor, first of all, it wasn't just the one time that he was not let out. He's suing here for three separate occasions. No, I'm telling you that it was one of the three seems the most difficult for you, and it's the one where the guard just – he asks and the guard says, no, forget it or whatever. I mean, he just doesn't believe him. He doesn't let him do it. Right? That's correct, Your Honor. Okay, so I'm asking you about that one. That seems the hardest one for your side of the case. Well, I think that was the second of the three occasions, and that would have been on April 2nd, 2009. That occasion happened before Mr. McNeil was issued any type of detail from health care. In fact, he had this enlarged prostate and he had requested a detail from health care that would say he's allowed to go out of his room to use the restroom during count. The health unit manager, in response to an inquiry from the warden, actually said the health care providers – Just correct me if I'm wrong. I thought before then he had been sued before for the count. Am I wrong about that? You are wrong, Your Honor. He's claiming that Cott denied him access two to three times per week or more. That was his testimony. So this is nearly every day he's asking and Officer Cott is telling him no because it's so frequent. It's nearly every day. Okay. Believing that the offer of the incontinence pads would solve that because clearly someone who cannot hold their hearing for 45 minutes, once a day at 11 o'clock every day, with a five-minute notice given, that person is incontinent. And he'd also gotten an in-cell urinal prior to April 2 for a brief period. He did, Your Honor. He had an in-cell urinal because it was confined to his cell, I believe, as a result of a misconduct ticket that he incurred. Any misconduct relating to having gone to the bathroom without permission? There were a couple of different misconduct tickets, Your Honor. He did receive a ticket related to the April 23, 2009 incident. He received, I believe it was, anticipating a direct order, an out-of-place ticket for leaving his restroom to self-use the restroom. Upon being informed he was going to receive those tickets, he called Officer Cott an asshole, and then he received a second major misconduct ticket for insolence. At some point he was confined to the cell for those two tickets, and he asked for and received a urinal to use in the cell. And it was taken away from him that time, was that it? Yes, Your Honor. That's the testimony. I thought the testimony from Officer Cott was that he just didn't believe him. Is it your claim that that testimony was related to one incident or to Officer Cott's assumption or decision that it was not a problem, period? I think the wording was he wasn't bending over, he wasn't holding himself. I wouldn't let him go because I had decided that there was no genuine urgent need. That is correct, Your Honor. Officer Cott did not believe he had an urgent need. He was showing up two to three times per week, if not more. Officer Cott also testified that it was his belief, if health care believed that this prisoner had a serious need to use the restroom, he couldn't hold it for 30 minutes. Health care would have given him incontinence pads or asked to move him to another cell with an in-room toilet. Health care didn't do those things. I thought the problem was that he went to health care and health care said, this is a custody issue, I can't do it for you. And then the warden said, go to health care and get a detail from them. Wasn't there kind of this cross discussion of whose authority it was to make that determination? It appears that way, Your Honor, but I think I can help clarify that as well. After the March 23rd incident, there was a nurse's note where the nurse said, this is a custody issue, health care can't just let you out of the bathroom. However, the nurse's supervisor, the health unit manager, we have a memo from her that's attached to Warden Woods' affidavit. That's Cunningham, Your Honor. That is Connie Cunningham, and she said that the health care providers, their position was this enlarged prostate problem that the prisoners were complaining about. This was not a medical condition requiring access to the restroom during count. But didn't Ms. Cunningham also say that she won't order that he be allowed to go during the count? But she supported the officers letting prisoners go once the count was complete. Yes, Your Honor, she did say she would support that if the officers wanted to let them out. And that's part of the issue before us since the refusal was to allow him to go after the count was complete and the porters had left their cells. Is that correct? Correct, Your Honor. And the medical detail that he did get, that was between April 2 and April 18, am I right? I don't know the exact date. I don't know the exact date, Your Honor. It was between those two dates. I believe it was the 14th or 16th. It was between the second date. Are you talking about the one from Wendy Ball? Or are you talking about the one from Tanya Cunningham? The memo from Tanya Cunningham is separate than the actual medical detail he got. The medical detail he received was the one that essentially reiterated the house unit rules. It says he could use the restroom with officer permission, essentially, which officer got. That was the 414 one from Wendy Ball, the extended bathroom privileges needed with officer authorization. Correct, Your Honor. And Officer Cobb testified that he called over to health care after seeing that detail because he'd never seen one like that before and got some guidance from them, asked them whether or not they intended for him, the prisoner, to be let out whenever, and they said no. I guess that's—help me understand, then, why this doesn't present a disputed material fact under the law that governs. I'm looking at the Eighth Amendment standard that says you've got to ask whether force is applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically to cause harm. And we've got an officer—I know there were a lot of people sued, but the court cleared everybody but two. That was all that was left and found that there was a disputed fact as to those two. And so we've got Officer Cott who's saying, I don't see an urgent need. You're not bending over or holding yourself. Then Tanya Cunningham says, well, I'm going to support the officers letting the prisoners go once count is complete. After that, there was still a refusal. Then Wendy Ball comes in and gives a medical detail extending the bathroom privileges and saying, with officer authorization. And my understanding of the evidence is that Cott called her up, figured out what she was saying exactly, and said, you still need my permission, and I'm going to exercise my discretion in this, and I'm not going to let you go. And then the deputy warden, Harwood, got involved with LeMonde and said, I think this is a correct quote, McNeil should probably be afforded an opportunity to use the restroom after the count is taken. Yet Cott still refused to let him do that after the count was taken. I'm struggling with why we don't have a dispute of material fact as to whether Cott was acting in good faith to maintain discipline, or frankly, acting either maliciously or sadistically to refuse to allow what his superiors had suggested would be the better course. Why doesn't this go to file? Yeah, I think because of the line of cases we have dealing with restroom issues. There's simply not a case or a line of cases out there that would establish that requiring a prisoner to remain in a cell for 33 to 46 minutes can violate the Constitution. Now, Cott's supervisors can think or believe whatever they want. He was the officer there watching those 100 prisoners during count. He was the one who would receive three days off. He testified if there was a count error. A single count error was an automated three-day suspension. Well, if the count is over and the warden doesn't see a safety or discipline problem in allowing the prisoner out, why do you think it doesn't create a dispute of fact as to what this officer said anyway today? I think that's a little bit incorrect, Your Honor, because the warden set up the rules. Generally, it's supposed to be a rare exception. It says, at that rate, the housing unit rules include the warden and Cott have testified. Rare occasional occurrence. This was two to three times a week or more. In addition, the warden didn't say he gets to come out after a count has left this building. The warden still relied on the officer's discretion. Aren't we talking about what a word or a statement meant and who is credible? And if that's the case, aren't we in classic disputes of fact that are to be taken up and resolved on the trial fact, the jury? Your Honor, we're here, I think, to accept McNeil's version of the facts. We're willing to do that in full. Still, under those facts and under the line of cases, there's simply not a case out there that says, even if everything McNeil alleged is true, this is not an constitutional violation at 46 minutes. We're willing to concede that the officer's supervisor said this. Would it be a potential violation without the offer of incontinence pads? Your Honor, I think that's a closer call. I think that the offer of incontinence pads, I mean, we have that here, and I think that certainly mitigates the problem to a large extent. I still don't think, even without the incontinence pads, that there was a clear violation in the existing case law. Okay, we'll have your time for rebuttal, Jackson. Your Honor, Professor Dan Manville, Michigan State University College of Law. I'm requesting permission for a law student, Caden Custin, to present oral argument on behalf of my colleague, Lance McNeil. That's granted in your name. Thank you, Your Honor. Good morning, Your Honor. My name is Caden Custin, and I'm here on behalf of Lance McNeil. Before I begin my argument, I want to briefly correct the appellants. I've stated multiple times during the course of their argument that there were issues where Mr. McNeil was coming to Officer Cott multiple times during their brief. That is not the case, according to the record, Your Honors. Mr. McNeil, respectfully requests that this court affirm the trial court's determination that this is in frivolous interlocutory appeal because the right to re-raise qualified immunity was waived, and that this court adopt the holding of a positive beginning to let trial courts make such a determination that would allow them to deny stays in trial while the appeal is moving forward. That's an interesting issue. We'll get to it in a minute, but let me ask you sort of procedural posture. When you just said that it wasn't that he came two or three times a week, there are three incidents that are the crux of most of the discussion. And as I understand it, this was a number of years ago. He's now in a different prison. Are you basically just asking for damages for these three incidents, or are you trying to get some kind of other relief of any sort? Damages for the three incidents, Your Honor. That's it. Okay, go ahead. On the forfeiture, and I think what you're really arguing is forfeiture here, is it possible that your side has a forfeiture problem of its own, that when there was a failure to—I mean, I think all that was mentioned between the Magistrate's report and the recommendation before it to Judge Quist was—I mean, they were talking about qualified immunity in one sense, right, because they were saying there was no way to prevent the violation. To the extent you think they should have also made arguments about prong two, the clearly established point, I didn't see any place where you identified at the stage between the report and recommendation in the district court, well, Your Honor, qualified immunity defense is out now because they have phased it. So, I mean, a rule we have is that, yes, one can have a forfeiture, but so can the person supposedly benefit from the forfeiture if that were identified. And, of course, that's why the district court in this instance dealt with the qualified immunity issues, which also makes it a little puzzling to say we can't reach them. So how do you respond to that? We're arguing, Your Honors, that forfeiture is not appropriate here because we filed a timely motion for reconsideration where the defendants did not, regarding the right to re-raise qualified immunity again. But will they give me a precedent that says you can make up for your forfeiture at the district court and reach the issues? I don't have any precedent, Your Honor. I would simply note that the trial court decided in its discretion to rehear the matter regarding whether there was a waiver of qualified immunity by the defendants. And remind me, did that happen after the appeal was filed or before the appeal was filed? It was when the defense came to my supervising attorney, Mr. Mandel, and was asking about getting a stay at trial on pending the appeal. So, but an appeal had been filed and then the district court issued a new order. That's correct, Your Honor. Well, doesn't the appeal divest the district court of jurisdiction? It divests it, Your Honor, of regarding the specific issue of qualified immunity on the merits what the trial court was noting was not that it was trying to prevent the appeal from moving forward in that regard. It was merely trying to move forward with the trial if that appeal was moving forward. But normally, not just normally, when you have an appeal, a qualified immunity appeal in your locutory, that's supposed to answer that question before you have the trial. Because it's immunity not only from damages but from suit. You know, if you have this sort of irreconcilable distinction or difference between the two, you have to take one, you either have to follow the rule that interlocutory appeals are permitted or you have to follow the notion that the district court can go ahead and vitiate that by having the trial, which is already being followed. Well, the Sixth Circuit, Your Honor, has recognized in the case versus the City of Cleveland that defendants can sometimes use these interlocutory appeals to prolong the litigation process, disadvantaging the plaintiff, which is why Mr. McNeil is requesting this court adopt a fossil begallion, which would clarify these very particular instances on not the average case but just these particular instances where it can certify an appeal as frivolous. When you say that we should adopt that, do you take the position that Yates doesn't, in fact, already adopt it, that it only suggested? The trial court, in its order, noted that it felt that it was unclear whether or not the Sixth Circuit had adopted it, which is why it's requesting, in its final order, that this court look at the resolution. You know the case of Dickerson v. McClellan, 37 F. 3rd 251, for a different panel in 1994. It notes that Yates is there, but it flatly says that it's not going to follow Yates, that we find no authority for a district court to do that. This is a factually distinguished case, Your Honors. In Dickerson, the district court prevented the appeal from moving forward, which was improper because it was the jurisdiction of the Sixth Circuit at that point. What the court here is asking to do is not to block the appeal moving forward, but rather to allow it to move forward and move forward with trial at the same time. There has been no trial, Your Honor. One was imminent at the time that the appeal was filed. Yeah, but I mean, is the plan now for everybody to wait to hear from us, is that correct? That's a fair point, Your Honors, yes. By statement, he's not going to get it. By what he says in later order, he's not going to get it. Okay. So how about on tool of qualified immunity? So you've got to show there's a constitutional violation or dispute to a fact about that. And then the second one is you've got to show there's a clearly established law. It seems like your main argument on that second point is this Concord-Hope-Chapelser case, which is helpful on the defundants' lack of access to a bathroom point, but boy, there was an awful lot more going on in that case. I think we would all agree. So I'm having a hard time saying that's the clearly established case for this one. If you can't use that one, where do you go? Well, Your Honors, there are some unpublished cases by the Sixth Circuit. We're relying primarily, as Your Honor said, on Hope v. Peltzer. I shouldn't preempt you. Tell me your Hope v. Peltzer argument. Including the outlandish heat and sun of the other mistreatment. Well, the guy suffered. Regarding Hope v. Peltzer, Your Honors, what we're arguing is the principle that the court reached in citing the case, not a factual similarity necessarily. The court concluded in addressing that case that deprivation of bathroom breaks that create a risk of particular discomfort and humiliation could violate the eighth amendment. What we're arguing, Your Honors, is that this goes above and beyond that point where the court was saying that a risk of discomfort or humiliation could cause eighth amendment claim. We're saying that not only did discomfort and humiliation occur, but discomfort went even beyond that to actual pain experienced by Mr. McNeil given his medical condition. Let me ask you, when we started out and said, okay, we're just relying on these three incidents, what do you take about the offer of incontinence pads? Because the question is deliberate indifference to a serious medical condition. As I understand it, the first incident that you rely on or that you complain of occurs before anything. The offer of incontinence pads is made between the first and second. And then the medical detail occurs between the second and third. So are all of the three incidents the same, or are there different factors at play as to whether they're deliberately indifferent to his medical needs? Regarding the offer of incontinence pads, Your Honors, Mr. McNeil believed that the offer was made in sarcasm. I saw that in your brief, but that didn't seem to me, unless you can persuade me that that's some kind of a legal principle, unless there was at least something where there's good reason to believe it was sarcasm, that other people had been told that and not given them or something, that just saying, I didn't believe it, doesn't seem to. The doctor's like, a man will set your leg, and you say, I don't think you really will. That's not deliberate indifference, is it? No, Your Honors. Mr. McNeil is arguing that he was only having these issues in particular with Officer Cott, with other officers who's having no issues. So because he's having specific issues in the sense that they would let him out? That's correct, Your Honor. He only had issues with the 11 a.m. hour count. But then I guess the other thing that's odd to me in helping on this is when you disclaim the two or three times a week, and Cott is the guard here most of the time during one particular time of day, is why did he let him out all the other times? If an officer is most of the time doing what you want, it's harder, as if you were asking for, he was doing it all the time, I could understand the dynamics, but can you help me here as to does McNeil have an argument as to Cott was feeling bad on this day or he had abused him or something? Why this day and not all the other time? I believe I misspoke before, Your Honors. Mr. McNeil, as you said, was with Officer Cott for a good portion of the week. He did not always have this issue at every hour count. He only had it on a couple of occasions. Some of those occasions… So you're saying that his urinary problems were not so great as to usually cause problems. Is that what you mean? That's correct, Your Honors. Because there's some reference in here about needing to go three or four times an hour, which in a 46-minute count, or even a 33-minute count, would cause problems most of the time. So I had a little bit of a problem understanding that. Mr. McNeil would use the restroom five minutes before each hour count, and that usually got him through. And as I said before, he didn't have any issues with that second part of the count, as Your Honors noted before. There's a portion of the count after the actual head count has been taken. And he hadn't had any issues at that point, given that he typically made the effort to use the bathroom five minutes before. So are you saying that most of the time, Cott would let him out after the slips went up? That's the phrase that's used. Are you saying that? Not with Officer Cott, No, Your Honor. He only had issues on those three particular occasions. Only on those three? With Officer Cott. That's correct. Okay. So how do these play out? You have different guards with different tolerances for security risks. And so you have some guards at certain count hours that just really have no problem letting Cott go to the bathroom. And other guards, for whatever reason, for the sake of argument, there's no malice. It's just a little more concerned about security. So how do these play out if you have someone who just says, No, I just don't do bathroom breaks. I mean, that's the whole point of the five-minute warning. And if you've got this kind of a problem, here's where the incontinence pads are. And that's just the way it goes in that particular prison at the 11 o'clock count. Why would that violate the Constitution? If you have the five-minute warning, some forms of incontinence, it's not even something that you control. So you really do have, there is no other answer than incontinence pads. It sounds like a client's problem. You can, but you have to go. So you do have your own internal warning. But, I mean, I guess I'm just struggling why that's deliberate indifference. If, you know, the problem is asked that the hospital is doing what it can to help with the medical condition, it can't not have counts. And for whatever reason, it just doesn't have excuses during the 30 to 45 minutes. Well, I guess I'm struggling with why it's deliberate indifference, I mean, to offer the incontinence pads for those people that have to go three or four times an hour. I mean, I don't think that's great. I sort of get that point, but I don't know why that's deliberate indifference, and I certainly don't know what case would say that's deliberate indifference. Your Honor, you – I'm just asking. I'm asking a fact pattern, which is not in this case. They don't allow any bathroom breaks. For whatever reason, at the 11 o'clock count, they just don't allow bathroom breaks. So you have 33, 45, and 46 minutes. You have individuals that go three to four times an hour. That's implicated by that kind of a delay, and everyone is given the option of the incontinence pads. How would that be deliberate indifference in that setting? I would argue first, Your Honor, since you were talking about security risk, that there is a security risk given that this is one individual looking to go at the same time that many reporters are leaving, addressing the specific issue of incontinence. At the same time that many reporters are leaving? During the second part of the hour count, Your Honor, after the head count has been taken, the prisoner reporters are allowed to leave their cells and perform their cleaning duties. But I presume those prisoner reporters are, in some sense, cleared or preferred or trustees is the word we used to use in my area. They have a similar exception to the one Mr. McNeil was hoping to use here, Your Honor. You mean similar, that is correct me if I'm wrong, or your adversary can correct me, is that these prisoner reporters, I would assume, are in some way checked out. They're felt to be people that you can allow to go out and somehow. Is that your argument, that they're just like everybody else, they just happen to be reporters? What I'm arguing, Your Honor, is that the reporters are afforded, or rather the officer, in this case, Mr. Palmer, is afforded discretion to allow reporters to leave their cells. It's the same scenario as with Mr. McNeil, just different circumstances. So just real quick, I'm going to see if time is up. Just a real quickie. Just say, in my hypothetical, there are no exceptions for anybody. Okay, so if it's not this case, I'm just imagining a world in which you have this length of count, no exceptions for anybody. If you have incontinence problems, there are incontinence paths. So maybe not the best way to deal with this problem, but the question is whether that would be deliberate indifference. What case would say that? There's no particular case that addresses that, given those facts, Your Honor. Do you mean that would be deliberate indifference? Mr. McNeil would argue so, Your Honor. Okay. Anything else? Thank you, counsel. Thank you, Your Honors. Thank you, Your Honors. I'd just like to point to the part in the record where Mr. McNeil testified that he did, in fact, ask two to three times per week to be let out to use the restroom. He's been denied. That's at Record 126-3, Page 24, McNeil's Deposition Lines 16 to 18, H.I.D. 1073. We can see, counsel, that we're struggling with the law. So help me with another example. We have someone who needs to go to the bathroom, a prisoner, who is denied. But he's only denied for the time that's 33 to 50 minutes, let's say. But the officer stands there and says, you're in my power. I'm not going to let you out of there. I don't care whether you have to go to the bathroom. Go to the bathroom on yourself, buddy, because I have the power to make you stay where you are, and I'm going to exercise it. I don't care that the medical detail tells me, yeah, let him out. I don't care that the warden tells me, let him out. I'm not going to do it because it's within my discretion, and you're just out of luck. That all surely dances to me on the line of maliciousness as opposed to appropriate discipline. Is it your position that because there's not a case that gives you that timeframe, that 30 minutes, even if the prisoner has to soil himself, that because of that 30-minute timeframe, not having a particular 40-minute case, that there's no particular case that would say that denying you the bathroom for 30 to 50 minutes is cruel and unusual or deliberate indifference, that this officer would be dismissed and that there would be no reason to go forward with the case? No basis. No, I'm sorry, that's not fair. No basis at law to go forward with the case. Your Honor, the MPMF talks about deprivations intolerable for prison confinement. People in society are routinely placed in scenarios where they're forced to go 33 or an hour without prison access. Maybe jurors waiting in the jury room, people boarding a plane waiting for takeoff. Officer Cotton, that's malicious all he wants as long as he doesn't violate a constitutional right. We have cases here— I'm asking you about the situation where somebody is saying these things to a prisoner, clearly. You know, I'm not going to let you. I'm not going to let you. I don't believe you or—too bad, just dance around the cell. I'm getting at admitted factual maliciousness that really doesn't relate to prison discipline. And it's a fair answer if you want to tell me too bad. I just want to understand why you think that doesn't create a dispute of fact under the Eighth Amendment that gets you to trial or in any circumstances do you think it would? Exactly because it is just a too bad situation, Your Honor. Bowles, for instance, 11 times urinated on himself, not a constitutional violation. Tate— I'm sorry, what was the name? That was Bowles, the three Bowles decisions that were cited, the second and third of those. That prisoner urinated on himself 11 times in a very similar situation as we have here, not a constitutional violation. Tate also discussed about this. It says—that's Tate v. Campbell, it's an unpublished Sixth Circuit decision. Mere feeling of discomfort from a full bladder is not a constitutional violation. That's our first and third instances here. Mr. McNeil only soiled himself on that one instance. That was before he had a medical detail. The District Court in Bowles said it was the third Bowles decision in August 20, 2010, specifically how, absent a medical detail, the officer doesn't have subjective knowledge. The cop testified, health care won't tell him what a prisoner requires except through a medical detail. He can't call it— The medical detail here came before the third incident but not before the first. Correct, Your Honor. Before the third incident, on the third incident, there was no soiling of Mr. McNeil. Thank you, counsel. Thank you, Your Honor. These will be submitted to the Court of Appellate of the United States.